UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

EDWARD L. BROWN, JR.,                    :
                        Plaintiff,       :
                                         :
            v.                           :        No. 5:25-cv-5008
                                         :
TOWER BEHAVIORAL HEALTH,                 :
                        Defendant.       :
_____

**O P I N I O N**
**Motion for Summary Judgment, ECF No. 18 – Granted**

**Joseph F. Leeson, Jr.**                                    **June 2, 2026**
**United States District Judge**

## I.    INTRODUCTION

For years, Plaintiff Edward Brown was the only black male employee working in

Defendant Tower Health's Admissions Department. When he was terminated from his position

by his white female supervisors, he brought this action for race discrimination, sex

discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, Section 1981 of

the Civil Rights Act of 1866, and the Pennsylvania Human Relations Act (PHRA). Defendant

Tower Behavioral Health has moved for summary judgment on all counts, arguing that Brown

fails to establish a prima facie case of discrimination and fails to show that Tower's reasons for

terminating Brown were pretextual. For the reasons discussed below, the Motion for Summary

Judgment is granted.

## II.   BACKGROUND

### A.   Factual Background[1]

#### i.   Brown's Employment, Discipline, and Termination

From around October of 2020 to August 14, 2024, Plaintiff Edward Brown worked as an Admissions Counselor for Defendant Tower Behavioral Health (hereinafter "Tower") in its Admissions Department. *See* Defendant Tower Health's Statement of Undisputed Material Facts ("SUMF") ¶¶ 2, 19, ECF No. 18-3. Tower is a "residential treatment facility located in Reading, Pennsylvania that provides inpatient and outpatient care for adolescents and adults with various behavioral health diagnoses." *Id.* at ¶ 1. In his role as an Admissions Counselor for Tower, Brown was responsible for processing new arrivals and intaking new patient information. *Id.* at ¶ 4. His responsibilities included conducting an initial suicide assessment of each patient, verifying their insurance benefits, and inputting accurate information about patients into various logs and electronic records. *Id.*; Brown Dep. 52:14—53:15; 59:13—60:6. Brown worked the night shift three nights per week, and reported to Admissions Director Jenny Palmisano, SUMF ¶ 2, who was responsible for hiring Brown in the Fall of 2020, *id.* at ¶ 2.

Throughout the course of his employment, Brown received training from Tower on the "essential duties of his role," including how to complete pre-certifications, intake insurance and

---

[1]   Except where otherwise indicated, the facts in this background section are not in genuine dispute. Citations are made to Defendant Tower Health's Statement of Undisputed Material Facts ("SUMF"), *see* ECF No. 18-3, insofar as they are admitted by Plaintiff Brown, *see* ECF No. 20, and if a fact is denied by Brown, said discrepancy will be explained. To the extent the SUMF references a document or exhibit that Brown contends "speaks for itself," the exact language of the document or exhibit will be quoted. When deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). All evidence must be considered in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). This background section is drafted accordingly.

other information into electronic platforms like "EPIC" and "Salesforce," fill and document available beds, restrain patients when necessary, and ensure that the Automated External Defibrillator ("AED") is operational. SUMF ¶ 5. Brown understood that these tasks were an essential part of his job as an Admissions Counselor. *Id.* Brown also signed an attestation in which he committed to adhere to Tower's employee policies—including standards of behavior, attendance, rest and meal breaks, progressive discipline, non-discrimination, and harassment— and acknowledged that failure to comply with these policies may result in disciplinary action, including termination of employment. *See* Brown Dep. at Ex. 13.

In 2023 and 2024, Brown was issued several "Progressive Discipline Forms" by Palmisano, Admissions Director, and Kirstie Rathman, Admissions Supervisor, *see* Brown Dep. at Exs. 14-21, none of which considered or mentioned Brown's race or sex, SUMF ¶ 15. On January 10, 2023, Brown was issued a written notice for "not using proper physical hold/restraint techniques" when responding to a "behavior code" on January 1, 2023. *See* Brown Dep. at Ex. 14. On May 24, 2023, Brown was issued a written notice for "sleeping during [his] scheduled shift," after the same "was previously discussed last June 2022, and coaching provided." *Id.* at Ex. 15. On March 27, 2024, Brown was issued a verbal warning because "[r]egistration was not completed for his assigned admission on 3/22" and "not completed for his assigned admission on 3/25/24," and because his "AED log/Temp log was not completed for 3 nights in a row." *Id.* at Ex. 16. On April 9, 2024, Brown was issued a written notice because he "did not show for his scheduled shift on 4/7/24" and "did not properly follow protocol for call out" when he was sick.[2]

---

[2]    Brown refused to sign this discipline form because he disagreed that the circumstances warranted a write-up. Brown states that he was hospitalized with pneumonia on April 7, 2024, and unable to call out four hours prior to the start of his shift, as required by Tower's attendance policy. Brown Dep. at 132:18—135:2.

*Id.* at Ex. 17. On May 7, 2024, Brown was issued a written notice for recording "[i]ncomplete information in Salesforce" and inaccurate information in "FLASH reports," for denying two referrals "for capacity, 'no bed' on 5/5 when there was an open available bed," and for marking tasks "as complete on admission board on 5/3 when they were not completed." *Id.* at Ex. 18. On May 30, 2024, Brown was issued a "Final Written" warning for "[m]arking tasks as complete when they are not complete," recording "incomplete" and "incorrect" information in EPIC, "not following up on tasks provided by previous shifts," "not communicating with staff during handoffs," and for "[l]ack of improvement since last write up in regards to behavior." *Id.* at Ex. 21. In the box designated "Employee Statement" on the May 30 discipline form, Brown wrote "I do not recall occurrences listed above." *See id.* Brown did not fill out an employee statement on any of his other prior disciplinary forms. *See id.* at Ex. 14-20. On August 14, 2024, Tower terminated Brown's employment for submitting "incomplete precerts," needing continuous "reminders," submitting incorrect flash reports, being "not receptive to feedback," and for overall "[l]ack of improvement since last write up." *See id.* at Ex. 22. While Brown disputes that he was solely responsible for many of the performance issues identified in his disciplinary forms, he agreed that Palmisano and Rathman "had a good faith and honest belief that the performance issues identified therein actually occurred." SUMF ¶ 15.

### ii.    Brown's Allegations of Discrimination

On May 8, 2024, Brown sent an email to Lyndsey Prat, Tower's Human Resources Director, *id.* at ¶ 3, stating "I have been having issues with the morning supervisor and staff member with their disposition and attitudes towards me," Brown Dep. at Ex. 20. In the email, Brown states that during one of his recent night shifts, he "did not have time to do pre-certs," and

the following morning, on April 23, he "felt like the admission counselor was indirectly attacking [him] like, they should've been done." *Id.* Brown's email continued as follows:

> The negative energy I felt after that morning called me to want to talk to the admission counselor and the morning supervisor about this. I felt low, targeted, and that nothing was[] good enough. I communicated via text with Jenny on April 23rd about how I was feeling just to keep her aware of what was going on. We never met to discuss how I was feeling, []which was a concern for me. On April 30th, I met with Admission Supervisor and admission counselor to discuss how the events on April 23rd made me feel. I explained to them how negative the energy is, in the morning when they come in . . . they don't speak when they come in . . . . I felt that the admission supervisor who is our leader should have addressed that issue. I feel belittled, incompetent, targeted, and []like I have to walk on eggshells. That morning, I also talked to admission supervisor one [on] one concerning the situation regarding admission counselor and the treatment I have been enduring from her an[d] other staff. It was reported that the admission supervisor is applying for Admission Director which draws huge concerns for me regarding equity, confidentiality, and treatment. [. . .]
> Following the April 30th discussion with the Admission Supervisor about my concerns and treatment in the department, I received a write-up which I feel is [a] form of retaliation. I feel that these action[s] listed on the write up could have been coaching points. The things listed are things that everyone in the office miss[es] or do[es] incorrectly. We all make mistakes. I am not sure if others are being targeted this way. I am the only African American that works in this office. I'm not sure if this is an issue of race discrimination but I don't feel safe going to work in these conditions. . . . after receiving this write-up I am feeling targeted and fearful that my job is in jeopardy. I'm not sure if others that work at night are being held to the same standard. I don't feel safe and at this point, with me feeling targeted, I don't know what to do. I don't want to lose my job . . . and would like to discuss this with you in person to develop some sense of job security considering my experiences with the other staff members.

Brown Dep. at Ex. 20. On May 9, 2024, Prat responded to Brown's email, saying she "would like to take some time to look into this matter" and asked to schedule a meeting for the following week. *See id.* On May 20, Brown followed up with Prat in the same email chain, saying "I want to be able to come to work and not feel like my job is in jeopardy. My issues have not been resolved and I have interact[ed] with individuals that make me feel uncomfortable. Hopefully, we can meet to discuss this at your earliest convenience." *See id.* On May 21, 2024, Prat and

Brown held a meeting, during which Brown told Prat that he believed he was being treated differently based on his race and sex. SUMF ¶ 17.

In or around May of 2024, Palmisano left Tower. *Id.* at ¶ 2. Rathman was promoted to Admissions Director and became Brown's direct supervisor. *Id.* Around the same time, Bryttny Hoffa, a fellow Admissions Counselor, was promoted to Admissions Supervisor. *Id.* at ¶ 3. Brown did not apply for the Admissions Supervisor or Admissions Director positions while at Tower. Brown Dep. 148:18—149:3. Around July 2024, two sets of flyers were posted on the doors of Tower's Admissions Office, featuring pictures of Rathman and Hoffa and the words "Congratulations on your promotion." *See id.* at 195:17—197:17; Ex. 26. Attached to these flyers was a sticky note with the words "Girl Power" surrounded by flowers and hearts. *See id.* Around this time, some employees in the Admissions Department also made t-shirts depicting a photo of Rathman and wore them around the office. *Id.* at 199:2—200:6.

Brown remarked that he found the sticky note discriminatory and the t-shirts "offensive," because he was the "only male" in his department. *Id.* at 192:8-19 ("Me being a male in the department, only male . . . why wouldn't it be? . . . Girl power? . . . those are two individuals that I had, you know, issues with and they're posted on the wall, they make shirts and they post girl power. Why?"); *see id.* at 196:23—198:3 ("I felt like it was discriminatory . . . this is not right, like, this culture of girl power."). Neither Palmisano, Rathman, Hoffa, or Prat were involved in making or posting the "Girl Power" sticky note or in creating the t-shirts. SUMF ¶ 22. Brown never heard Palmisano, Rathman, Hoffa, Prat, or others in his department make any racist or sexist comments, slurs, or jokes. *Id.* at ¶ 20. Still, the day after his termination, on August 15, 2024, Brown sent an email to Tower's Chief Executive Officer, Jenna Pacini, which said, "I have been targeted, retaliated, bullied, racial discrimination. . . . [their] plan was to directly write me

up for things to eventually get to a final write up for termination," and "[a]s a male, in the department, "Girl Power" comes off as sexist, a sense of entitlement and controlling." *See* Brown Dep. at Ex. 27.

**B.      Procedural History**

Brown filed his Complaint in this Court on September 2, 2025. *See* Compl., ECF No. 1. In it, Brown alleges that Tower retaliated and discriminated against him on the basis of his race and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and e, *et seq* (Count I), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count II), and the Pennsylvania Human Relations Act (PHRA) 43 P.S. §§ 951-963 (Count III). *See id.* The Complaint alleges that Tower discriminated against Brown by "unjustifiably criticizing his work" compared to that of his white female coworkers, and that he was the only employee in his department who was reprimanded for poor performance even though his white female coworkers made similar mistakes. *See id.* at ¶¶ 10, 19. The Complaint also alleges that Tower discriminated against Brown by displaying the promotion flyers, the "Girl Power" sticky note, and t-shirts in the workplace around the time Rathman and Hoffa were promoted, and by failing to investigate Brown's complaints of discriminatory treatment. *See id.* at ¶¶ 8-23. The Complaint further alleges that Tower retaliated against Brown by disciplining and later terminating him after he complained about the disparate treatment he was receiving. *See id.* at ¶¶ 19-23.[3]

---

[3]      Brown stated that he believes that the difference in treatment he received "could be sexism . . . [or] could be race." *See* Brown Dep. 127:11—128:25. When asked if he was "making a guess . . . that [his] discipline had something to do . . . with [his] race and [his] sex," Brown answered, "Yeah, yes." *Id.* at 129:7-11. When asked if his claim of sex discrimination was based on "the fact that you are a man and your supervisors were all women," Brown responded, "Yes . . . that's it." *Id.* at 173:16-23. Brown confirmed that the flyers, the sticky note, and the t-shirt with Rathman's picture on it formed the factual basis for his claim of sex discrimination. *Id.* at 201:11-16. When asked if he had any other facts to support his claim of race discrimination,

Tower filed its Answer to the Complaint on October 7, 2025. *See* ECF No. 7. Tower then filed a Motion for Summary Judgment on March 9, 2026, in which it argues that Brown fails to allege facts sufficient to establish a prima facie case of discrimination or retaliation, and that even if he did, Tower has a legitimate, non-discriminatory reason for each challenged employment action. *See* ECF No. 18. Brown responded to the Motion for Summary Judgment on April 2, 2026. *See* ECF No. 20. Tower replied to Brown's response on April 14, 2026. *See* ECF No. 21. The Court is now prepared to render a decision on the Motion for Summary Judgment.

## III.    LEGAL STANDARDS

### A.        Motion for Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that

---

other than the fact that "[he is] a Black man and the people who were issuing the discipline are not Black men," Brown responded, "No." *Id.* at 172:23—173:11.

the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B.    Discrimination Claims

#### 1.    Race and Sex Discrimination under Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act (PHRA) – Review of Applicable Law

Federal law prohibits employment discrimination based on race, color, religion, sex, national origin, age, and disability. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Likewise, the Pennsylvania Human Relations Act (PHRA) makes it unlawful for any employer to "refuse to hire or employ or contract with, or to bar or to discharge from employment [an] individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract" on the basis of "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability. . . ." 43 Pa. Stat. Ann. § 955(a). "Disparate treatment claims under Title VII and the PHRA 'are governed by essentially the same legal standards.'" *Sheehan v. Everstory Partners*, 815 F. Supp. 3d 357, 373 (E.D. Pa. 2025) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016)); *see Young*

9
060226

*v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010) ("PHRA violations are subject to the same analysis as Title VII claims.") (citing *Gomez v. Allegheny Health Servs., Inc.,* 71 F.3d 1079, 1083–84 (3d Cir. 1995)). Absent direct evidence of discrimination, such disparate treatment claims are analyzed using the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 527 (3d Cir. 2007); *also Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 359 (E.D. Pa. 2023) ("In the absence of direct evidence of discrimination, courts apply the well-established burden-shifting framework articulated in *McDonnell Douglas*."), *on reconsideration in part*, 702 F. Supp. 3d 317 (E.D. Pa. 2023); *see also Young*, 749 F. Supp. 2d at 288.

"Under the McDonnell Douglas paradigm, an employee must first establish a prima facie case of discrimination." *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). To establish a prima facie case of employment discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). The Third Circuit Court of Appeals has "defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). At this initial stage, the plaintiff is not required to "establish but-for causation as part of [his] prima facie case," *Sheehan*, 815 F. Supp. 3d at 379 (quoting *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017)), and need only "proffer evidence sufficient to raise the inference that . . . [the]

protected activity was the *likely* reason for the adverse employment action" in order to demonstrate a causal link. *See id.* at 253. The central focus is "whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15. (1977)).

If the plaintiff successfully pleads a prima facie case of discrimination, the burden "shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold*, 409 F.3d at 184. If the employer articulates one or more such reasons, the aggrieved employee must then proffer some additional evidence, either direct or circumstantial, "that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." *Id.* at 184; *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made." *Rabinowitz*, 252 F. App'x at 527. The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted). In other words, to survive summary judgment, the plaintiff must show that his protected trait was at least one "but-for" cause of the employer's adverse action, even if multiple but-for causes contributed to the employment decision.[4]

---

[4] While the burden shifting framework for employment discrimination claims has remained consistent since *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the guidance as to the plaintiff's final burden of proof has evolved. Prior to the year 2020, it was said that to survive summary judgment in a Title VII case, a nonmoving plaintiff bearing the final burden had to either discredit the employer's articulated legitimate reasons or otherwise prove that his

*Tannous*, 697 F. Supp. 3d at 359 n.6 (citing *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020) ("When it comes to Title VII . . . the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.")). "It is important to note that although the burden of production may shift during the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]." *Fasold*, 409 F.3d at 184 (internal quotations omitted). *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining that once a prima facie case is made, the law creates a "presumption" of unlawful discrimination, which is rebutted if the employer articulates a legitimate nondiscriminatory reason for the its action, but the "presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the ultimate burden of persuasion") (internal quotation marks omitted).

---

protected trait was a "motivating" or "determinative" factor in the adverse employment decision. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020) (explaining prior guidance) (citing Civil Rights Act of 1991, § 107, 105 Stat. 1075, codified at 42 U.S.C. § 2000e–2(m)); *see, e.g.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (To establish causation in a Title VII discrimination case, "[s]o-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); *Young v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) ("[A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.") (cleaned up)). Then, in 2020, the United States Supreme Court in *Bostock v. Clayton County* clarified that the appropriate causation test for Title VII discrimination claims is the "simple" and "traditional" standard of but-for causation, which directs courts to change one contributing factor at a time and see if the outcome (*i.e.*, the occurrence of the adverse action) changes. *See* 590 U.S. at 656. The Court explained that this but-for causation standard can be "sweeping" as there are often multiple but-for causes for an adverse action. *See id.* The legal standard herein reflects the current understanding of a broader but-for causation standard, as articulated by the Supreme Court.

12
060226

### 2. Race Discrimination under Section 1981 of the Civil Rights Act of 1866 – Review of Applicable Law

Section 1981 of the Civil Rights Act of 1866 provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he phrase 'make and enforce contracts' is broadly defined to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" 42 U.S.C. § 1981(b). Generally, claims brought under Section 1981 of the Civil Rights Act of 1866 are also subject to the same *McDonnell Douglas* burden-shifting analysis applied to Title VII claims. *See Anh Truong v. Dart Container Corp.*, No. 09-cv-3348, 2010 WL 4237944, at *4 (E.D. Pa. Oct. 26, 2010), *adhered to on reconsideration sub nom. Truong v. Dart Container Corp.*, No. 09-cv-3348, 2010 WL 4611980 (E.D. Pa. Nov. 12, 2010) (explaining that the Third Circuit applies the same Title VII analysis to claims "brought under Section 1981 of the Civil Rights Act of 1866") (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–182 (3d Cir. 2009)).

To establish a prima facie case of race discrimination under Section 1981 of the Civil Rights Act of 1866, "a plaintiff must plead (1) that he is a member of a racial minority, (2) intentional discrimination on the basis of race, and (3) discrimination concerning at least one of the activities in the statute, which includes the right to make and enforce contracts." *Tannous*, 697 F. Supp. 3d at 361 (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)). A successful Section 1981 claim differs from a Title VII discrimination claim in that, first, a plaintiff setting forth a claim under 42 U.S.C. § 1981 must allege, inter alia, a clear *intent* by the defendant to discriminate on the basis of race, *Anh Truong*, 2010 WL 4237944, at *4 (citing *Carpenter v. Ashby*, 351 F. App'x 684, 687 n.6 (3d Cir. 2009)), and second, a Section 1981 plaintiff bears the burden of pleading at the start, and proving at the summary judgment stage,

13
060226

that *but-for* his race, he would not have suffered the loss of a legally protected right.[5] *See*

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). For Section

1981 claims, "it is no longer sufficient, even at the pleading stage, to argue that race was a

'motivating factor' in the loss of a legally protected right. *Tannous*, 697 F. Supp. 3d at 362

(citing *Comcast Corp.*, 589 U.S. at 336-41).

C.   **Retaliation Claims under Title VII, the PHRA, and 42 U.S.C. § 1981 – Review of Applicable Law**

To establish a prima facie case of retaliation under Title VII, the PHRA, or Section 1981

of the Civil Rights Act of 1866, "a plaintiff must show: (1) protected employee activity; (2)

adverse action by the employer either after or contemporaneous with the employee's protected

activity; and (3) a causal connection between the employee's protected activity and the

employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *see*

*Boykins v. SEPTA*, No. 17-1980, 2018 WL 460652, at \*2, \*6 (3d Cir. 2018) (analyzing claims

under Title VII and the PHRA the same); *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410,

424 (E.D. Pa. 2023) (explaining that plaintiffs can bring retaliation claims under 42 U.S.C.

---

[5]   Much like how the Supreme Court clarified the causation standard for Title VII claims in *Bostock*, *see* note 4, *supra*, the Supreme Court clarified the causation standard for claims brought under 42 U.S.C. § 1981 in *Comcast Corp. v. National Association of African American-Owned Media* that same year. *See* 589 U.S. 327 (2020). Unlike the history of Title VII practice, which long advocated for use of a "motivating factor" test at the pleadings stage (if not at all stages of litigation) *see* note 2, *supra*, Section 1981 has always "follow[ed] the usual rules" for causation, *see Comcast Corp.*, 589 U.S. at 341. "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Id.* Unlike Title VII claims, Section 1981 claims require the plaintiff to plead but-for causation in his *prima facie* case. *See id.* Similar to Title VII claims, the burden of persuasion always remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing Fed. R. Evid. 301) (other citations omitted); *see also Nahas v. Shore Med. Ctr.*, 473 F. Supp. 3d 383, 405-06 (D.N.J. 2019), *aff'd*, 828 F. App'x 89 (3d Cir. 2020) ("Although 'the burden of production may shift [for Section 1981 claims], the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'") (quoting *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999)).

§ 1981, per *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452, 457 (2008), and that retaliation claims brought under Section 1981 and Title VII have the same elements). A "plaintiff making a retaliation claim need not prove the merits of the underlying discrimination complaint, but only that a reasonable person in these circumstances would have concluded that the employer was engaging in discriminatory conduct." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.9 (3d Cir. 2007) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 344 (3d Cir. 2006)); *see Speed v. WES Health Sys.*, 93 F. Supp. 3d 351, 356 (E.D. Pa. 2015) ("In order to show that specific conduct is protected under Title VII, a plaintiff does not need to prove the merits of the alleged underlying discrimination, 'but only that he was acting under a good faith, reasonable belief that a violation existed.'") (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Pursuant to the first element, a report to a superior may constitute protected activity where discrimination is specifically alleged in the verbal or written report. *See LeBlanc v. Hill Sch.*, No. 14-cv-1675, 2015 WL 144135, at *14 (E.D. Pa. Jan. 12, 2015) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)); *see also Moore*, 461 F.3d at 341 (adding that the employee must have a good faith, reasonable belief that the activity complained of is unlawful (citing *Clark Cnty v. Breeden*, 532 U.S. 268, 271 (2001))). As to the second element, a plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Under the third element, a plaintiff must show a causal connection between the protected activity and the retaliatory act. *Id.* at 341-42. Retaliation claims "must be proved according to traditional principles of but-for causation . . .

[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see Yarnall v. Philadelphia Sch. Dist.*, 57 F. Supp. 3d 410, 433–34 (E.D. Pa. 2014). In determining causation, courts often look to the "temporal proximity between the protected activity and the alleged discrimination" and "the existence of a pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (internal quotation marks omitted) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)), *overruled on other grounds by Burlington Northern*, 548 U.S. 53. Since there is no single, definite way of showing causation, the court must look at the evidence "as a whole" to determine if retaliation has been sufficiently pled. *See Jensen*, 435 F.3d at 450 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000)).

IV.     **ANALYSIS**

      A.     **Race discrimination**

            1.  **Title VII and the PHRA**

Brown has failed to state a claim for race discrimination under Title VII and the PHRA because he cannot establish that Tower's alleged adverse actions occurred under circumstances giving rise to an inference of discrimination. As for the first two elements of Brown's prima facie case of race discrimination, the factual record demonstrates (1) that Brown was the only black man working in the Admissions Department at Tower, Brown Dep. at 192:8-19; 197:1—198:3, which places him in a protected class, *see* 42 U.S.C. § 2000e-2(a)(1); 43 Pa. Stat. § 955(a); and (2) that Brown was hired by Palmisano after a review of his education, certifications, and experience, *see* SUMF ¶ 2; Brown Dep. at Exs. 1-10, and completed additional on-the job training, SUMF ¶ 5, signifying that he was qualified for the job he had. As

for the third element, which requires an adverse employment action, the record demonstrates that Brown was disciplined more frequently than his white female coworkers, *see id.* at 127:11—128:25, 172:23—173:11; Exs. 14-21, and that he was terminated soon after two of his white coworkers were promoted, SUMF at ¶ 2, 19. The Court finds the allegations of excessive discipline sufficient to state an adverse employment action. This District has before found there to be no adverse action where an employee received only "four instances of minor discipline that did not result in a 'significant change' in his employment," *see Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 95 (E.D. Pa. 2023), *aff'd*, No. 23-2962, 2024 WL 3534478 (3d Cir. July 25, 2024), but has found that an adverse action existed where an employee received an "official reprimand" affecting the "terms and conditions of employment," *see Daniels v. Sch. Dist. of Philadelphia*, 982 F. Supp. 2d 462, 481 (E.D. Pa. 2013), *aff'd*, 776 F.3d 181 (3d Cir. 2015). Here, Brown was issued at least seven official disciplinary "write-ups" within his last two years of employment, ranging from "verbal warnings" to a "final written warning" prior to his termination. *See* Brown Dep. at Exs. 14-21. With each progressive discipline form, Brown came closer to losing his job as an Admissions Counselor. Brown's final written warning and his termination form referenced his prior write-ups as having informed Tower's decision to terminate Brown's employment. Hence, the Court finds that Tower's recurrent discipline of Brown altered his "terms, conditions, or privileges of employment." *See Storey*, 390 F.3d at 764. Accordingly, the Court finds that Brown's discipline and ultimate termination constitute adverse employment actions for the purpose of his prima facie case of race discrimination.

As for the fourth element, however, the record is devoid of factual examples giving rise to an inference of race discrimination. It is undisputed by the parties that neither Palmisano nor Rathman considered Brown's race or sex in issuing the disciplinary forms. SUMF ¶ 15. Brown

never heard Palmisano, Rathman, Hoffa, Prat, or any of his other coworkers in the Admissions Department make any racist comments, slurs, or jokes. *Id.* at ¶ 20. Brown points to the fact that he was disciplined disproportionately to his white coworkers, despite others making similar mistakes, but chose not to explain this perceived difference in treatment in the "employee statement" box on his disciplinary forms. *See* Brown Dep. at Exs. 14-20. Moreover, Brown's email to Prat merely stated that the performance errors he was disciplined for are "things that everyone in the office miss[es] or do[es] incorrectly. We all make mistakes. I am not sure if others are being targeted this way. I am the only African American that works in this office. I'm not sure if this is an issue of race discrimination." *Id.* at Ex. 20. When asked about the alleged disparate treatment he received compared to his white coworkers, Brown remarked that it "could be" due to his race, but that this was a "guess." *Id.* at 128:19—129:11. Moreover, when juxtaposing his discipline and termination with his white coworkers' promotions, Brown confirmed he did not even apply for the Admissions Supervisor or Admissions Director positions and thus could not have been considered. *Id.* at 148:18—149:3. Simply put, Brown draws *correlations* between his perceived mistreatment and Tower's adverse actions but cannot draw a causal *connection* and show that the employment actions likely occurred due to some racial animus. *See Sheehan*, 815 F. Supp. 3d at 379. Brown has no other facts to support his claim of race discrimination, other than the fact that "[he is] a Black man and the people who were issuing the discipline are not Black men." Brown Dep. 172:23—173:11. Brown was "not sure" whether Tower employees were acting discriminatorily or not, and a mere "guess" is insufficient to give rise to an inference of discrimination.[6] Brown has therefore failed to state a prima facie case of

---

[6]    Since the Court finds that Brown failed to state a prima facie case of race discrimination, the burden does not shift to Tower to articulate a non-discriminatory reason for its action and the Court concludes its analysis here.

racial discrimination. Judgment is granted in favor of Tower and against Brown on the racial discrimination claims brought pursuant to Title VII and the PHRA.

### 2.  Section 1981 of the Civil Rights Act of 1866

As for Brown's claim of race discrimination brought pursuant to 42 U.S.C. § 1981, he cannot satisfy the second element needed for a prima facie case because he cannot establish that Tower intentionally discriminated against him on the basis of race. Section 1981 requires that Brown present "direct evidence of discrimination," which the Third Circuit has defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the plaintiff's race] in reaching their decision to fire [the plaintiff]." *Brown*, 581 F.3d at 183 (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002)). Having already found that Brown failed to plead facts sufficient to give rise to an *inference* of racial discrimination, *see* section IV(A)(1), *supra*, the Court is unable to find that *direct* evidence of racial discrimination exists. With this in mind, the Court also finds that Brown is unable to establish but-for causation as required for a prima facie case under Section 1981. *See Comcast Corp.*, 589 U.S. at 341. Judgment is granted in favor of Tower and against Brown on the claim of racial discrimination brought pursuant to 42 U.S.C. § 1981.

### B.  Sex discrimination under Title VII and the PHRA[7]

Similar to his claims of racial discrimination, Brown's claims for sex discrimination under Title VII and the PHRA fail because he cannot establish that Tower's alleged adverse actions occurred under circumstances giving rise to an inference of discrimination. The record on summary judgment demonstrates that Brown was the only male employee in the Admissions Department at Tower, *see* Brown Dep. 192:8-19; 197:1—198:3, which is sufficient to allege membership in a protected class, *see McDonnell Douglas Corp.*, 411 U.S. at 802; *E.E.O.C. v. Allstate*, 778 F.3d at 448-49 (explaining, in a Title VII case, that federal law prohibits employment discrimination based on sex). As discussed above, there are ample facts to support the assertion that Brown was qualified for the position he held as Admissions Counselor. *See* section IV(A)(1), *supra*. Thus, the first two elements of Brown's prima facie case of sex discrimination are established. As for element three, the discussion above applies insofar as Brown pleads that his work was unjustifiably criticized compared to that of his female coworkers, *see* Brown Dep. at 127:11—128:25, 172:23—173:11; Exs. 14-21, and that he was terminated soon after two of his female coworkers were promoted, SUMF at ¶ 2, 19. These allegations are sufficient to allege an adverse employment action.

At this point, Brown's allegations of sex discrimination, much like his allegations of racial discrimination, stem from the fact that Brown was the only black man working in his

---

[7]    The Court notes that Brown indicated, albeit inconspicuously, in his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, that he "is not pursuing his initial claim of sex discrimination." *See* ECF No. 20 at 32 n.1. Yet Brown did not openly and voluntarily dismiss this claim, and in the same breath says "[t]his is an employment discrimination case in which Brown contends he was discriminated against because of his race and sex." *Id.* at 32. Considering this, and the fact that Brown has intertwined his allegations of race and sex discrimination in Counts I and III, in which he alleges disparate treatment and retaliation under Title VII and the PHRA, the Court will still engage in a discussion of Brown's sex discrimination allegations.

department and the Tower employees that disciplined him, terminated him, and were later promoted, were all white women. *See* Brown Dep. 173:16-23. Brown made a "guess" that the difference in treatment he received "could be sexism." *See id.* at 127:11—128:25. This is not enough to give rise to an inference of sex discrimination. Notably, however, Brown makes additional allegations of sex discrimination stemming from the events of May 2024 and the months that followed, when Rathman and Hoffa received their promotions. The record reflects that congratulatory flyers were posted in Tower's Admissions Office, featuring pictures of Rathman and Hoffa and the words, "Congratulations on your promotion," *See id.* at 195:17—197:17; Ex. 26. Brown takes issue with the "Girl Power" sticky note attached to these flyers, *see id.*, and the congratulatory t-shirts depicting a photo of Rathman which were worn by coworkers in the office. *Id.* at 199:2—200:6. When asked why he found these events to be discriminatory against his sex, Brown replied, "Me being a male in the department, only male, why -- why wouldn't it be? . . . Girl power? . . . those are two individuals that I had, you know, issues with and they're posted on the wall, they make shirts and they post girl power. Why?" *Id.* at 192:8-19. This is not enough to establish a prima facie case. The record is not in dispute that the "individuals" Brown had issues with, or spoke to about his concerns (*i.e.*, Palmisano, Rathman, Hoffa, and Prat) were not involved in making or posting the "Girl Power" sticky note or in creating the t-shirts. SUMF ¶ 22. Brown never heard anyone in the Admissions Department make a sexist comment, remark, joke, or innuendo, *Id.* at ¶ 20, let alone one directed at him. He only alleges that the "girl power" sticky note "could be" directed at him, because he was the only male employee in the department, Brown Dep. 194:13—195:10, and believes that in the context of a female-led department, *id.* at 194:13-19, "this culture of girl power" just "is not right," *id.* at 197:1-3. Brown's reference fails to acknowledge that the cultural use of the term "girl power"

began, and is often used, as a means of female empowerment.[8] Without evidence to the contrary, it appears likely that the "girl power" sticky note represented a similar intention—a means of congratulating Rathman and Hoffa on their promotions, and empowering women in the department, generally. Brown does not suggest that the sticky note was used outside of this context in a way that changed its meaning to one with discriminatory intent.[9] The sticky note and the t-shirts with Rathman's picture on it form the only remaining factual basis for Brown's claim of sex discrimination.[10] Brown Dep. 201:11-16. While Brown has made clear that he felt

---

[8]    The term "girl power" was popularized in the 1990s and early 2000s by female pop-music group, the "Spice Girls," whose song lyrics are rooted largely in themes of female empowerment, a term oft defined as the act of encouraging women to "do whatever it is [they want] to do" or to become who they want to become. *See* Patrina Ozurumba, *Girl Power: How Female Entrepreneurs Can Overcome Barriers to Successful Businesses*, 34 Women's Rights L. Rep. 24, 54 (2012) (citing Susan Hopkins, *Girl Heroes: The New Force in Popular Culture* 33 (Pluto Press 2002)).

[9]    Context matters. In *Henrich v. Henkels & McCoy, Inc.*, this District found that where a female employee complaining of gender discrimination was told by HR personnel to "stop it with the girl power," that a reasonable jury could find the term "girl power" in that context to be "demeaning in a very gender-specific way," particularly when "followed by the suggestion that the company would stop hiring women entirely should 'women [keep] causing problems.'" No. 20-cv-6281, 2022 WL 3701969 at *3 (E.D. Pa. Aug. 26, 2022). In that instance, the term "girl power," despite being directed at a woman, was not used in its traditional, empowering sense. *See id.* In the instant case, the facts are not in dispute as to where and how the phrase "girl power" appeared in Tower's workplace, and there is no indication that it was directed at Brown or used in a way other than to empower women in the workplace.

[10]    Worth mentioning are Brown's allegations that Palmisano "failed to investigate" his complaint in April 2024 that Rathman and Hoffa were "unjustifiably criticizing his work, but not the work of his White female co-workers, because of his race and sex," Compl. ¶ 10, that Pratt "failed to investigate" his complaint in May 2024 that "he was being bullied and harassed by Rathman[n] and Hoffa, including the 'girl power' and related activities . . . mistreating him and singling him out because of his race and sex," *id.* at ¶ 16, and that no one investigated his complaint when he reiterated these concerns in June and August of 2024, *id.* at ¶¶ 17-18. While still a novel cause of action, courts within the Third Circuit have indicated that an employer's failure to investigate claims of harassment can be discrimination in violation of Title VII if the failure to investigate is based on the victim's sex. *See Kahriger v. Becerra*, No. 23-cv-4384, 2025 WL 3269940, at *4 (E.D. Pa. Nov. 24, 2025); 2024 WL 2136011, at *4 n.4 (E.D. Pa. May 13, 2024); *Cherkasky v. Boyertown Area Sch. Dist.*, No. 5:21-cv-5204, 2022 WL 1965899, at *7 (E.D. Pa. June 6, 2022); *McFalls v. BrightView Landscapes, LLC*, No. 18-cv-2871, 2020 WL 1922828, at *7 (E.D. Pa. Apr. 21, 2020) (citing *Hare v. Potter*, 220 F. App'x 120, 134 (3d Cir.

offended by these events, these undisputed facts do not suggest that Brown's sex was a likely reason for the sticky note being posted, for his progressive discipline write-ups, or for his ultimate termination. The Court finds these facts insufficient to give rise to an inference of sex discrimination. Judgment is granted in favor of Tower and against Brown on the claims of sex discrimination brought pursuant to Title VII and the PHRA.[11]

---

2007)). However, for a failure-to-investigate claim to be successful, "the issue complained of, if left uncorrected, must be of enough significance to qualify as an adverse action." *McFalls*, 2020 WL 1922828, at *7. While it is unclear whether Brown intended to assert a disparate treatment claim on this basis, the Court finds that, to the extent one is asserted, it fails as a matter of law. Such a claim does not arise when an investigation has been conducted, and the plaintiff is merely dissatisfied with the results. *Kahriger*, 2024 WL 2136011, at *4 (citing *Cherkasky*, 2022 WL 1965899, at *7; *McFalls*, 2020 WL 1922828, at *7).

　　Here, Brown's allegations are contradictory. Brown claims that Tower failed to investigate his complaints but acknowledges in his Answer to Defendants' Statement of Undisputed Material Facts that Prat conducted an investigation into Brown's complaint of sex discrimination, *see* ECF No. 20 at 5 ¶ 18 ("It is admitted that in connection with her investigation of Brown's complaint of race and sex discrimination, Prat only interviewed Palmisano, Rathman[n], Hoffa, and Carey."); *see id.* at ¶ 34 ("Prat testified that she investigated an Ethics Point complaint opened by Brown against Rathman on May 19, 2024, and met with Brown in connection with that complaint."). In his deposition, Brown further acknowledges Prat's investigation into his complaints of discrimination. *See* Brown Dep. 162:24—163:8 (when asked if Brown "would have expected [Prat] to investigate those concerns by speaking to the people that you had accused of treating you inappropriately," Brown responded, "Yes," and when asked if he knew whether "she did that," Brown responded "As I recall, yes."); *id.* at 165:25—166:3 (when asked whether "Prat told you that she had investigated and was unable to substantiate your allegations and concerns," Brown responded, "Yeah, yeah."). At bottom, Brown seems to only take issue with the fact that "[n]one of [Prat's] investigations resulted in a finding of discrimination." *See* ECF No. 20 at 5 ¶ 31. Mere disagreement with the results of an investigation is insufficient to state a claim for disparate treatment based on an employer's failure to investigate a sex discrimination complaint. *See Cherkasky*, 2022 WL 1965899, at *7; *McFalls*, 2020 WL 1922828, at *7. To the extent Brown attempts to plead such a claim, judgment is granted in favor of Tower and against Brown.

[11]　　Because the Court finds that Brown failed to state a prima facie case of sex discrimination, the burden does not shift to Tower to articulate a non-discriminatory reason for its action and the Court ends its analysis here.

### C.    Retaliation

Brown's retaliation claims cannot survive summary judgment because the record fails to support a causal connection between Brown's alleged protected activity and any adverse action by Tower. *See Krouse*, 126 F.3d at 500. Retaliation claims require traditional but-for causation, *Nassar*, 570 U.S. at 360, and absent direct evidence, courts may consider temporal proximity between the protected activity and adverse action, as well as any intervening antagonism occurring between the two events, *see Jensen*, 435 F.3d at 450, to determine if such but-for causation exists. Here, Brown contends that certain write-ups and other instances of workplace discipline were a "form of retaliation" by Tower. Brown Dep. at Ex. 20. More specifically, Brown alleges that the discipline he received, and his ultimate termination from employment, were retaliation in response to Brown's internal complaints about receiving disparate treatment in the Admissions Department. Compl. ¶¶ 19, 21, 23, 27, 31, 35.

Temporally, Brown's complaints of workplace mistreatment began with his email to Prat on May 8, 2024, wherein he described a generally tense work environment with "negative energy" and a disciplinary write-up that he did not agree with, stating "I'm not sure if this is an issue of race discrimination." Brown Dep. at Ex. 20.[12] To the extent Brown argues that this email triggered Tower's discipline of his work performance, the Court is aware of roughly seven progressive discipline forms issued to Brown between January 2023 and his termination in

---

[12]    The record also reflects that Brown filed an internal complaint against Rathman via "Ethics Point" on June 13, 2024, but this complaint did not concern race or sex discrimination and thus will not be considered as "protected activity" for the purpose of deciding Brown's retaliation claims. *See* ECF 20 at Ex. D-10. The Ethics Point complaint merely stated that Rathman "might be promoted to Director of Admissions" and that this was "concerning" to Brown, given Rathman's friendships with other Admissions Department employees—behavior that Brown believed crossed "inappropriate boundaries" because it meant Rathman's friends were not held accountable for their workplace mishaps. *See id.*

August 2024, and five of the seven were issued *prior* to Brown's May 8, 2024 email to Prat. *See id.* at Exs. 14-21. Separately, to the extent that Brown asserts he was terminated in response to this May 8, 2024 email, his termination occurred three months later. It is undisputed that none of Brown's coworkers ever made any racist or sexist comments, jokes, slurs, or innuendos, let alone any directed at Brown, and thus the record is devoid of examples in which Tower employees antagonized Brown in the summer months of 2024. The Court is reluctant to find that the demeanor of Brown's coworkers, however unpleasant, or the disciplinary write-ups issued in late May and August of 2024, constitute "intervening antagonism" by Tower employees. If at all related to the May 8, 2024 email, Tower's actions are not found to be retaliatory in nature.

Brown also alleges that following his May 8, 2024 email, he reiterated his concerns via additional complaints in June and August of 2024, Compl. ¶¶ 17-18, but it is unclear how or when these complaints were made, and to whom. This alone does not present a genuine issue of material fact. The record shows one email, sent from Brown to Tower's CEO, Jenna Pacini, on August 15, 2024, describing his concerns of race and sex-based discrimination *following* his termination on August 14, 2024. *See* Brown Dep. at Ex. 27. Chronology indicates that Brown could not have been disciplined and terminated in retaliation for this August 15 email, which occurred one day after the alleged retaliatory conduct.[13]

In all, it is undisputed that none of Brown's progressive discipline forms mentioned, or were made in consideration of, Brown's race or sex, SUMF ¶ 15, including the one detailing the reasons for his termination. There are simply no facts to suggest that Tower's employment

---

[13]   Brown also indicates that he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the Pennsylvania Human Relations Commission ("PHRC") but does not allege that Tower retaliated against him for doing so. *See* Compl. ¶ 3. All the same, the Court is unable to consider whether Tower's discipline and termination of Brown constitute retaliation for these charges because it is unclear when they were filed.

actions were taken based on race or sex-based animus. After looking at the evidence "as a whole," *see Jensen*, 435 F.3d at 450, the Court finds that no reasonable person in these circumstances would have concluded that Tower was engaging in discriminatory conduct, *see LeBoon*, 503 F.3d at 232 n.9. Brown's complaints of alleged discrimination were not a but-for cause of any adverse action by Tower. Judgment is granted in favor of Tower, and against Brown, for the claims of retaliation under Title VII, the Civil Rights Act of 1866, and the PHRA.

## V.    CONCLUSION

The Court finds that no dispute exists as to any material fact pertaining to Brown's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the Pennsylvania Human Relations Act. Defendant Tower is entitled to judgment as a matter of law on all claims. Accordingly, judgment is entered in favor of Tower, and against Brown, on Counts I through III of the Complaint. Tower's Motion for Summary Judgment is granted.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge